## FOSTER *vs.* GODDARD.—GODDARD *vs.* FOSTER.

1. An exception to a master's report is not in the nature of a special demurrer, and is not required to be so full and specific.
2. It is only necessary that the exception should distinctly point out the finding and conclusion of the master which it seeks to reverse.
3. An exception so made brings up for examination all questions of fact and law arising upon the report of the master, relative to that subject.
4. Where parties associated in trade contract that one partner shall receive a certain share of the profits arising from the sale of goods, deducting "the actual expenses that may appertain to the goods themselves," taxes, clerk-hire, and advertising are as clearly chargeable among these *expenses* as storage, commission or insurance.

Cross appeals from the Circuit Court of the United States for the district of Massachusetts.

The facts, pleadings, and points of this case are so fully stated by Mr. Justice *Swayne,* that any other report of them cannot be made without repeating what he has said in his opinion.

*Messrs. Bartlett* and *Sohier*, of Massachusetts, for complainant.

*Mr. Goodrich*, of Massachusetts, for respondent.

Mr. Justice SWAYNE. These are cross appeals of the same cause in equity. Foster is the complainant, and Goddard the respondent. The record is voluminous. The questions presented for our consideration are questions of fact. No legal question arises in the case, with the exception of a single point touching the form and effect of exceptions to a master's report. The case involves nothing else that can be of interest in any other case. We have considered it with all the care which the magnitude of the amounts involved, and the fulness of preparation and ability with which it has been presented, demand at our hands.

Upon some of the points pressed in the argument at bar, we have found difficulty in reaching conclusions satisfactory to ourselves, and such as we could all unite in. In the end, we have been able to do so.

We adopt the analysis of the case presented in the opening brief of the counsel of the complainants. It has the double merit of brevity and extreme clearness:

"The bill alleges the execution by the parties of two several contracts, bearing date, respectively, June 24, 1843, and May 7, 1849.

"By the first of these complainant was to proceed to Valparaiso, remain there five years, and devote himself exclusively to the transaction of respondent's business, for which he was to receive, at the end of said five years, a portion of the net profits. By the second contract the complainant was to proceed to the west coast of South America, and devote his time to the management of respondent's business in those parts, and also in Mexico and California, for which he was to receive, on his return, a portion of the profits of the business, in the trade which complainant should have conducted to completion. This agreement also provided that complainant might terminate the contract at any time, by giving so much notice that any voyage respondent might have commenced previous to the

receipt of such notice should receive the benefit of complainant's services to its final accomplishment. The prayer was that an account might be taken, and respondent decreed to pay complainant what was due.

"On the 3d of August, 1857, the respondent filed his answer, in which he admits the execution of said contracts, the rendition of the services by said Foster, and the possession of books of account, from which the amount, if any, due said Foster can be ascertained; alleges reasons for his delay in making up said accounts, and avers that the last mentioned contract determined on 31st of December, 1850.

"On the 13th of August the complainant filed an amended bill, setting forth more particularly the mode in which the business was conducted, and the accounts kept and rendered to respondent, through the house of Alsop & Co.

"To this respondent filed an answer on the 4th of September, 1857. To this the general replication was filed, and the cause, by consent, was sent to a master to take an account, with special instructions. On the 8th May, 1858, the complainant, by leave of the court, withdrew his replication, and filed another amendment, alleging an agreement between the parties, that the second voyage of the ship Crusader should be taken and deemed within the said first agreement. To this the respondent filed an answer denying the allegation. The general replication was then filed, and the cause was then committed to the same master, with instructions similar to those formerly given.

"The master made his report June 2d, 1858, to which the respondent alleged ten exceptions.

"The cause came on for hearing before the Circuit Court, for the first circuit, at the October term, 1858. The learned judge, by his decree, sustained the first and tenth of the exceptions, and overruled the rest, and ordered the master's report to be reformed accordingly, which was done.

"From this decree the complainant and the respondent severally appealed."

We have considered all these exceptions with care. The argument at bar was confined chiefly to the first, second, third,

and tenth. The complainant objects to the action of the court touching the first and tenth, which were sustained. The defendant objects, because the second and third were overruled. In regard to the fourth, fifth, sixth, seventh, eighth, and ninth exceptions, it is sufficient to remark, that we see no reason to doubt the correctness of the master's findings to which they relate. In this we concur with the court below. They were not pressed by the defendant's counsel in the argument at bar. We deem it unnecessary to discuss the evidence, or the legal views by which the master's conclusions are sustained.

Before proceeding to consider the four remaining exceptions, we deem it proper to advert to an objection made to their form by the counsel for the complainant. It is said that such an exception is in the nature of a special demurrer, and that these are not so full and specific that the court can consider them.

Such is not the rule of this court. All that is necessary is, that the exception should distinctly point out the finding and conclusion of the master which it seeks to reverse. Having done so, it brings up for examination all questions of fact and of law arising upon the report of the master relative to that subject. The exceptions in this case are sufficiently full. They are in accordance with the experience of each member of the court in the administration of equity jurisprudence elsewhere.

We come now to the consideration of the exceptions which have been specially named.

"Second exception: For that the said master has erroneously charged this respondent with the sum of seventeen hundred and eighty-nine dollars and eighty-nine cents, the amount of a loss made in the prosecution of the business aforesaid, by a sale of goods to the New England Worsted Company, for which they have not paid, but refuse to pay."

The master's report, touching this subject, is as follows:

"The company were charged, on the books of Goddard, with the sum of $2,173 04, on the balance of an account due for wool; but the amount due was in dispute between them In 1850 or 1851 the company tendered in payment about

$1,500, which Goddard declined to receive. Nothing further was done by either party until January, 1857, after the claim had been outlawed three years, when the company offered the sum of $1,789 89, but Mr. Goddard refused to receive it, and also declined to permit Foster to receive his proportion of that sum.

"It is contended by the respondent that he had a right to conduct his own business in his own way, being responsible to Foster only for any want of good faith, and that he was neither bound to accept a sum less than what he believed to be due, nor to institute a suit to recover what he claimed; and that if any loss has thereby occurred, it is properly chargeable to the business.

"The management of the business, including the collection of the accounts, was under the absolute control of Goddard, and in conducting it he was responsible, I think, only for the exercise of good faith and ordinary diligence. He was not bound to accept the sum less than what he believed to be due; and if he had instituted a suit to recover the full amount, Foster would have undoubtedly been bound by the result. But was he at liberty to do neither? As between parties situated as were these, the authorized duty to collect being vested solely in one, and the amount of the compensation of the other depending, in a measure, upon the manner in which that duty should be performed, was it reasonable prudence or diligence for Mr. Goddard to decline either to receive what the debtor offered to pay, or to enforce the payment of what he himself claimed to be due? It is well settled, that if executors or trustees allow a debt against a solvent debtor to become outlawed, they are chargeable with the amount."

There is no complaint that the master has misapprehended the facts or stated them incorrectly. We are entirely satisfied with the views he has expressed and the conclusion at which he arrived.

"Third exception: For that the said master has allowed to the complainant, under the contract of June 24th, 1843, one-tenth of the profits made by this respondent in the construction and subsequent sale of a vessel commonly called the Valdivia,

which vessel was not employed in, nor put into, the business of this respondent, carried on under the contract aforesaid."

Upon this subject the master reported:

"This was a new ship, built by Mr. Ewell under a contract made by him with Mr. Goddard; was launched on the 15th of October, 1846, and was sold by Mr. Goddard to the United States Government the 7th December, 1846, at a profit. The validity of this claim depends upon the construction to be given to the following clause in the agreement of 1843:

"And furthermore, said Goddard has the right of purchasing, selling, and chartering the vessels designed for the trade, at his option, the loss or profit attendant thereon to be charged or credited in the general account. It is also understood that said Foster's interest of one-tenth is liable to the full extent for all the risks and casualties in the business, attendant upon the goods and vessels.

"This vessel was never actually employed in the business of this trade. On the other hand, there is evidence tending to prove that she was originally contracted for by Mr. Goddard, was built and was designed for this trade; that Mr. Goddard had engaged a part of her outward cargo; that these facts were communicated by him to Mr. Foster; and that, under instructions from him, Mr. Foster had procured a portion of her first return cargo. She was sold, (so far as the evidence shows,) however, before any cargo had been laden on board of her at Boston.

"March 17th, 1846, Goddard wrote to Foster: 'I have contracted for a new ship of 550 tons, in the hopes of having one that will make her outward passage in sixty-five or seventy days; what shall be her name? I understand that Valdivia, the name of a province,' &c.

"Again, August 22d, 1846: 'Capt. Millet waits for the Valdivia, which will be despatched in November.'

"October 12th: 'The Valdivia will be launched to-morrow, and will be our next ship. She will not, however, sail earlier than the 1st to the 15th December, it being impossible to obtain any cotton goods before that time, *although engaged some time since.*'

· "October 13th, the next day: 'Don't sell anything to arrive by the Valdivia.'

."January 5th: 'Doubtless you will be surprised, perhaps disappointed, in seeing this vessel (the Santiago) instead of the new ship; but the truth is, I have been tempted to sell her to our Government for some nine or ten thousand dollars above cost, cash in hand. She is now called the Supply.'

"It is contended by the respondent, that the complainant was only entitled to a share of the profits of such vessels as were actually employed in the trade, and not of those which might have been designed for the business, but not actually employed in it; that although Goddard may have intended the Valdivia for this trade, yet that he abandoned that intention before carrying it into effect, and that the agreement of 1843 did not restrict him from pursuing business on his private account.

"This agreement contemplated not only the *employment* necessarily of vessels carrying on this trade, but also as subservient to the main business, *the dealing* in vessels to a certain degree as subjects of trade; and this branch of the business was under the exclusive control of Goddard. It may be true that he was at liberty to pursue other business; but none the less for that reason was all that appertained to this agreement a distinct and independent business, and so to be preserved. Whatever act Goddard did, he did it with reference to one business or the other; either for the joint or for his private account. Whatever property was procured by him was procured *eo instanti* for one business or the other, and thereafter belonged to that business, and its character in this respect could not depend upon any subsequent purpose of Goddard, suggested by the results of the particular adventure. The proper effect, therefore, of the fact that Mr. Goddard was not restricted from other business is, that he was thereby bound still further, if possible, to preserve, with the most scrupulous exactness and good faith, the two businesses entirely distinct, marked and unconflicting, so that there should be neither temptation nor opportunity, after having procured a vessel on one account, to subsequently change its destination, according as the adven

ture promised a profit or a loss. Whatever Goddard did under this agreement was at the common risk, and for the common benefit. If, in the honest exercise of his discretion, he had purchased a vessel for this trade, which proved immediately after the purchase wholly unfit for the business, and she was sold at a loss, can it be doubted that this loss would have been properly chargeable in the general account? On the other hand, if he had purchased, or by mutual consent had built a vessel for this trade, and the same had been sold at a profit before being employed, that profit, as it seems to me, equally belongs to the general account."

We have only to add, that if the Valdivia had been burned at any time before she was sold, we cannot doubt that Foster, under the circumstances, must have borne his share of the loss. He could not be liable if loss were to be borne, and excluded if profit were made.

The following is the first exception. It was sustained by the court:

"First exception: For that the said master has not allowed to the said respondent, and has not permitted him to debit the business of this respondent, carried on by him under the contract dated June 24, 1843, sundry sums of money paid by the said respondent in the regular and usual course of his said business for clerk-hire, taxes, and advertising, to wit: thirty-eight hundred and thirty-eight dollars and seventy-eight cents for clerk-hire, seventeen hundred and eleven dollars and ninety cents for taxes assessed upon the property employed in said business, and three hundred dollars paid for advertising his said business; the said sums amounting in the aggregate to fifty-eight hundred and fifty dollars and sixty-eight cents, all which were proper expenditures in the course of the said business."

The solution of the question presented by this exception must depend upon the construction given to the following clause of the first agreement between the parties:

"In consideration of which said Goddard engages that said Foster shall, at the expiration of five years, be entitled to one-tenth of the net profits of his business in that trade, after de-

ducting interest, at the rate of six per cent. per annum, on the capital invested; and all costs and expenses of whatever name and nature that may be incurred, both at home and abroad, in sailing, victualling, manning, keeping in repair the vessels employed, including all port charges, as also the actual expenses that may appertain to the goods themselves, including the cost of said Foster's living, which is not to exceed six hundred dollars per annum."

If the charges for taxes, clerk-hire, and advertising claimed are allowed, it must be under the terms, "the actual expenses that may appertain to the goods themselves." We are all of opinion that those terms are comprehensive enough to include these items. It was certainly not the intention of the parties that the defendant should make a donation by any expenditure in the business. The computation should be made as if he were engaged in no other business. The items in question are as much a part of "the actual expenses," appertaining "to the goods themselves," as storage, commission, or insurance. They rest on the same foundation, and the same language in the contract which affords a warrant for including the latter applies with equal force to the former.

"Tenth exception: For that the said master has allowed the complainant one-fourth of the profits made by this respondent in the use and employment of a vessel called the Harriet Erving, and its cargoes, during her third voyage, which was not sought to be recovered by the complainant in his original or amended bill, which vessel and cargoes, and the profits resulting therefrom during the said voyage, were not embraced in the contract of May 7th, 1849, nor by any contract or agreement made by the respondent with the complainant, but were solely and exclusively at the profit and loss of the respondent."

The provisions of the contract of 1849, to be considered in connection with this exception, are as follows:

"That said Foster engages to proceed at once to the west coast of South America, and that he will devote his whole time in those parts, as also in Mexico and California, exclusively to the management of all said Goddard's business in those countries, such as the sale and purchase of merchandise, and any

other property, collecting freight moneys, procuring freights and consignments of goods, eliciting orders for the purchase and shipment of property, investing money, drawing and negotiating bills of exchange, and forwarding all the information that can be obtained respecting the trade; in fine, to transact any and all business that may be required of him by said Goddard, in accordance with his instructions and best interests, which he is also to care for, and protect from impositions, unjust charges, and also extravagant expenditures of the shipmasters, to the best of his ability.

"In consideration for which, said Goddard engages that said Foster shall, on his return, be entitled to one-fourth part of the net profits of his business in that trade that he (said Foster) shall have conducted to completion, after deducting, &c.

"It is understood that said Foster is to leave in the hands of said Goddard, bearing interest, what funds he may have— less two thousand dollars, to be paid him before leaving this country—and that neither the same nor any portion of his profits shall be abstracted, until he shall see fit to withdraw from the present arrangement, which he is at liberty to do at any time, by giving said Goddard so much notice that any voyage he may have commenced previous to receipt of such advice shall receive the full benefit of all said Foster's services to its final accomplishment, and not otherwise. It is also understood that said Goddard has the right to annul this agreement whenever he may choose to do so; and furthermore, that said Foster is liable to the full extent of his interest and means for all the losses that may be made in this business, as also for all the risks and casualties attendant thereon."

It is not material to inquire whether this agreement made the parties co-partners. It provided a definite mode of terminating the agreement by Foster. Pursuant to that provision, Foster, on the 22d of February, 1850, addressed a letter to Goddard, giving him notice that he proposed to join the house of Alsop & Co., of Valparaiso, on the 1st of January following, and on the day preceding to terminate the agreement between Goddard and himself. In that letter he said:

   *   *   * "After our long and satisfactory connection to-

gether, I must say that I leave it with many regrets; and I doubt not but the feeling is mutual. The truth is, however, that the connection, to a certain extent, will still exist. But, by the articles of this house, no active partner can have any interest out of the establishment, and they are bound down in the most particular manner."

The letter, it seems, was received by Goddard about the 1st of April, 1850. On the 13th of that month he replied in a letter to Foster, "I am very glad to learn your decision to join the house, it being what I would have advised for your own interest."

In Foster's reply of the 29th of May, 1850, he says:

\* . \*   \*   "I did not expect you would be able to say whether you intended sending Mr. Erving immediately or not. Be that as it may, you may rely with safety upon my exertions and interest in your favor as much as ever, and also as if you had an agent upon the spot."

On the 1st of January, 1851, Foster, according to the notice given by his letter of the 22d of February, 1850, entered the house of Alsop & Co. From that time new relations subsisted between him and Goddard. He ceased to be bound or able to "devote his whole time in those parts, as also in Mexico and California, exclusively to the management of said Goddard's business in those countries, such as," &c., (see contract.)

*All the requirements* of the contract as to Foster's services were the consideration of Goddard's agreement as to Foster's compensation. After the 1st of January, 1851, Foster could not, as an honest man, without the consent of Alsop & Co., (which is not shown,) have "any interest out of the establishment." According to the notice given by Foster, and accepted by Goddard, the contract between them was to terminate on the 31st of December, 1850. The complainant's bill avers that it did then terminate.

"And your orator further showeth that the said co-partnership business was forthwith entered upon and conducted by your said orator and the said Goddard until the thirty-first day of December, A. D. one thousand eight hundred and fifty, when the said agreement was terminated by the said orator's

giving due notice to the said Goddard in the manner provided for in and by said agreement."

The Harriet Erving sailed from Boston for Valparaiso upon the voyage in question on the 21st of August, 1850, more than four months after Goddard received Foster's notice. She arrived at Valparaiso on the 8th of December, 1850; sailed for Coquimbo on the 27th of the same month; for Talcuhano on the 4th of January, 1851; and in the same month for Boston, where she arrived on the 7th of April, 1851. The new agent of Goddard arrived at Valparaiso about the 1st of November, 1851. The selling of the Harriet Erving's outward cargo commenced soon after her arrival at Valparaiso, and was continued down to June, 1853. The entire amount of the net proceeds was $205,620 74. All the sales were made by Alsop & Co., who received commissions amounting in the aggregate to $9,736 26. Nearly one-half of the cargo in value was sold before Foster entered the house of Alsop & Co. Upon that part which was sold after that time, he was entitled to a share of the commissions, as a member of that firm. Before Foster entered the house, all sales, in the course of the business, had in form been made by Alsop & Co., who received a commission for both selling and guaranteeing. The homeward cargo of the Harriet Erving had all been provided by Foster before her arrival at Valparaiso. Numerous letters from Goddard to Foster are produced, containing isolated expressions, which seem to imply that he regarded Foster as having an interest of some sort in this voyage of the vessel.

After a careful examination of this part of the case, we are brought to the following conclusions:

1. That the agreement of May 7, 1849, was wholly put an end to on the 31st day of December, 1850, by the parties, in the manner therein provided.

2. Its termination at that time was not waived by either of the parties.

3. If it were not terminated at that time we should be compelled, under the circumstances, to regard the averment of the bill upon that subject as conclusive.

In equity proceedings the proofs and allegations must agree. A party can no more succeed upon a case proved, but not alleged, than upon a case alleged, but not proved. 9 Cranch, 19, *Simms* vs. *Guthrie et al.;* 9 Pet., 483, *Harrison* vs. *Nixon;* 10 id.; 178, *Boone* vs. *Chiles;* 3 Barb's C. R., 613, *Trip* vs. *Vincent et al.;* 3 Ohio R., 61, *Bank United States* vs. *Shultz;* 5 Dana, 552, *Sadler* vs. *Grover;* 1 J. J. Marsh, 237, *Breckenridge* vs. *Ormsby.*

4. That the complainant not having "conducted to completion," within the life of the contract, "the business in that trade" growing out of this voyage of the Harriet Erving, that branch of the case is not within the contract of May 7th, 1849, and hence not before us.

It follows, in our judgment, that the court decided correctly in sustaining this exception.

It may be that the complainant has a valid claim to be paid for his services under an implied contract upon the principle of *quantum meruit.* But as that is an inquiry outside of the case as now before us, it is neither necessary nor proper that we should express any opinion upon the subject.

*The decree of the Circuit Court must be affirmed, with costs.*