## VICTOR CHRISTGAU v. WOODLAWN CEMETERY ASSOCIATION, WINONA, MINNESOTA.[1]

July 26, 1940.

Nos. 32,544, 32,545.

[1]Reported in 293 N. W. 619.

264

*A. H. Jacobson* and *George W. Olson,* for plaintiff-appellant.
*Sawyer & Sawyer* and *Tawney, Smith, Tawney & Libera,* for defendant-appellant.

PETERSON, JUSTICE.
This action is brought under the Minnesota unemployment compensation law, 3 Mason Minn. St. 1940 Supp. §§ 4337-21 to 4337-42, to recover unemployment compensation contributions from defendant as an employer of labor. There are 12

causes of action set forth covering the period from January 1, 1936, to September 30, 1939.

Defendant makes two claims of exemption from liability. One is of total exemption upon the ground that it is a corporation organized and operated exclusively for charitable purposes. The other claim of exemption is partial and relates to the services of a part of defendant's employes who are employed in its greenhouse, which it claims are exempt as agricultural labor.

Defendant was organized as a public cemetery in 1862 under R. S. 1851, c. 37. It is governed now by 2 Mason Minn. St. 1927, §§ 7557-7624. The answer alleges that defendant was organized for the sole purpose of operating and maintaining a public cemetery; that it was authorized by law to engage in no other business, except such as is incident thereto; that it has no stock; that its members are the owners of the lots; that its members are not liable to assessment by it; that its trustees serve without compensation; and that no part of its earnings or any profit inure to the benefit of any individual or member.

Defendant has a permanent improvement fund for the perpetual care of burial lots, which was established pursuant to statute. This and the income therefrom, it is alleged, may not be used for any purpose other than that for which the fund was established. Certain trust funds are held by defendant upon trusts specified by the donors. Defendant has other funds, received and to be used exclusively for upkeep and maintenance of the cemetery.

The answer further alleges that defendant owns 216 acres of land. Of this, 94 acres are stated to be suitable and used for burial purposes. The other 122 acres are incapable of and unsuited for being platted or used for burial purposes and form a background and setting of beauty and grandeur for the 94-acre portion. Defendant has the usual maintenance equipment consisting of trucks, tools, etc.

Plaintiff demurred to the answer. The demurrer was sustained as to those parts in which defendant claimed a partial exemption on the ground of agricultural labor, and was overruled as to the defense of exemption upon the ground that defendant was organized and operated exclusively for charitable purposes. The questions are certified to be important and doubtful. Both parties appeal.

PLAINTIFF'S APPEAL.

The claim of exemption as a charitable corporation is based on 3 Mason Minn. St. 1940 Supp. § 4337-22H, which so far as here material defines employment as follows:

"(6) The term 'employment' shall not include:

\* \* \*

"(i) Services performed in the employ of a corporation, community chest, fund, or foundation, organized and operated exclusively for religious, *charitable*, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual."

This provision is exactly the same as the corresponding provision of the federal social security act. The argument in support of the claim that defendant is a charitable corporation is that it is operated without profit and financial benefit to any member or individual in discharging the public function of providing burial for the dead. It is claimed that constitutional and statutory provisions exempting the burial grounds of cemeteries from taxation and execution give support to that view; but exemption from the tax in question is not claimed in virtue of such provisions.

■ Defendant contends that it is a corporation organized and operated exclusively for charitable purposes for the reason that it is engaged in the public function of providing a suitable place for the burial of the dead without profit. Its contention is that, since its function is public and it is operated without profit, it is a public charity.

It is true that providing a burial place for the dead is a function of a public nature, which might be imposed as a duty on governmental subdivisions. Brown v. Maplewood Cemetery Assn. 85 Minn. 498, 89 N. W. 872; Wolford v. Crystal Lake Cemetery Assn. 54 Minn. 440, 56 N. W. 56. A corporation organized and operated without profit to discharge a function of a public nature is not a charitable corporation. Defendant relies on the rules obtaining in equity for defining a charitable use within the purview of 43 Eliz. c. 4, under which a charitable purpose embraces the improvement and promotion of the general welfare. But that rule has no application where, as here, there are constitutional and statutory provisions indicating that the word "charitable" is used in a restricted sense not comprehending other enumerated subjects. The enumeration in our constitution and statutes of public charities, cemeteries, institutions of learning, and other subjects indicates that each of the subjects enumerated is distinct from the others. Distinction rests on difference. The meaning of the word "charitable" will be so restricted as to exclude subjects that might otherwise be included in the word in order to observe the differences between the subjects enumerated. These principles are settled in accordance with the weight of reason and authority by our decision in State v. Bishop Seabury Mission, 90 Minn. 92, 95 N. W. 882, 883, where an institution of learning claimed that its endowments were exempt from taxation on the grounds that it was both a charitable institution and a college or seminary of learning. We held that, while the purposes of the institution were charitable under 43 Eliz. c. 4, and the rules governing charitable gifts and uses in equity, those rules were not applicable and that the question was one of constitutional construction. The constitution (art. 9, § 1) enumerates as subjects of exemption from taxation public burying grounds, public schoolhouses, public hospitals, academies, colleges, universities, seminaries of learning, churches, church property, houses of worship,

*institutions of purely public charity,* public property used exclusively for public purposes, and certain personal property in limited amount. Several of the subjects enumerated partake of a public nature such as public burying grounds, schools, hospitals, institutions of learning, and public property used for public purposes. None of them are owned or operated for profit. Our reasoning was to the effect that each subject enumerated was to be differentiated from the others to give meaning and effect to the words used; that enumeration involves classification based on differences between the subjects enumerated; that the process places each subject in its own class and gives it a meaning of its own; that by the same token it excludes each subject from the classes to which others are assigned; and that, where the law, constitutional or statutory, indicates that there is a difference in subjects enumerated, the distinction should be observed. We pointed out that the institution involved was of a public character, saying [90 Minn. 97]:

"The work of such institutions is done primarily for the individual educated, but results ultimately in the public good. Their function is largely public, and property possessed by them is devoted, not to private gain to individuals, but to a beneficent use—the education and enlightenment of the citizen."

But notwithstanding its public character and that it was operated without profit, the institution was held not to be a public charity. We held that the term "purely charitable institution" was to be restricted in meaning so as to differentiate such institutions from the others enumerated, and said [90 Minn. 95]:

"So that a 'purely charitable institution,' within the meaning of this constitutional provision, may be said to be an institution organized for the purpose of rendering aid, comfort, and assistance to the indigent and defective, open to

the public generally, conducted without a view to profit, and supported and maintained by benevolent contributions."

By this process of reasoning and under this definition, defendant is not an institution of purely public charity. A cemetery can no more be said to be a public charity than it can be said to be an institution of learning or one of the other enumerated subjects.

While the reasoning in the Bishop Seabury Mission case, 90 Minn. 92, 95 N. W. 882, explodes the argument that defendant is both a public charity and a public cemetery, some other thoughts might be added. Education has from the earliest times been regarded as a matter of vital concern, in consequence of which provision has been made in our constitution (art. 8) and by statute to insure an adequate system of education. See State ex rel. Klimek v. School Dist. No. 70, 204 Minn. 279, 283 N. W. 397. Thereby not only the public purpose, but the governmental duty with respect to education is recognized. However important burial of the dead may be, no similar provisions relating thereto are to be found. Hence the claim of the institution of learning in the Bishop Seabury Mission case, that it was a public charity, was stronger than is that of defendant here.

Furthermore, our statutes with respect to corporations and trusts observe and reinforce the distinctions that have been stated. 2 Mason Minn. St. 1927, c. 58, enumerates something like 30 different kinds of corporations, including cemeteries, §§ 7557 to 7624-1 (public), §§ 7625 to 7634 (private), and corporations to administer charities, §§ 7901 to 7902. Section 7901 provides: "A corporation may be formed under the provisions of this subdivision for the purpose of administering and furnishing relief and charity for the worthy poor who may reside in a designated locality * * *." No one would claim that defendant comes within that language. The distinction is also observed in § 8090-1, which authorizes trusts "for any charitable, benevolent, educational, religious or other public use or trust."

Where state constitutions and statutes like ours enumerate public burying grounds, charitable institutions, institutions of learning, and other subjects of regulation or exemption from taxation, the overwhelming weight of authority by reasoning and holding analogous to that in the Bishop Seabury Mission case is that a public cemetery operated without profit is not a charitable institution. In re Estate of Hill, 131 Me. 211, 160 A. 916, 83 A. L. R. 928; Bullock v. Commr. of Corps. & Taxation, 260 Mass. 129, 156 N. E. 743; Inhabitants of Milford v. County Commrs. 213 Mass. 162, 100 N. E. 60; In re Estate of Beekman, 232 N. Y. 365, 134 N. E. 183; In re Downer's Estate, 101 Vt. 167, 142 A. 78. The case of Donnelly v. Boston Catholic Cemetery Assn. 146 Mass. 163, 15 N. E. 505, 507, was stronger in its facts in favor of the claim that the cemetery was a public charity than the one at bar, but the holding was against the claim. There the action was in tort against a public cemetery association for wrongful burial of a stranger in a grave belonging to plaintiff. The defense was that defendant was a public charity and not liable in tort under the rule there prevailing. It was shown that defendant furnished graves free to persons dying indigent. Here there is no such showing. There, as here, the claim was made that the cemetery discharged a public function in providing a burial place for the dead without profit which might have been imposed as a public duty on the city where the cemetery was located. The court held that the defendant was not a public charity, in an opinion by Mr. Justice Holmes, who said [146 Mass. 166]: "There is no pretense that the defendant is acting as an agent for the city. We think that there is equally little ground for calling it a charitable corporation."

A corporation which owns and operates a public cemetery without profit is not organized exclusively for charitable purposes, within the meaning of clauses excluding corporations organized and operated exclusively for charitable purposes from state unemployment compensation acts which, like ours, copied

the exclusion clause from the federal social security act. Proprietors of Cemetery of Mount Auburn v. Fuchs, —— Mass. ——, 25 N. E. (2d) 759; Industrial Comm. v. Woodlawn Cemetery Assn. 232 Wis. 527, 287 N. W. 750. There is no authority to the contrary. Defendant is precisely what it purports to be— a public cemetery and not a public charity.

■ Perhaps it is not necessary to say more, but we deem it proper to answer other arguments made by the parties. So far we have resorted only to intrinsic aids to construction. Extrinsic aids of practically conclusive character in support of our views are found in the history and the purposes of the legislation.

The history of § 4337-22H shows that it was copied verbatim from the exclusionary clause of the federal social security act, which in turn was copied from the federal income tax act. The meaning of the words "a corporation * * * organized and operated exclusively for * * * charitable * * * purposes" in the federal acts was that a public cemetery was not a charitable institution the same as if there had been explicit definition to that effect. The state statute adopted the language of the federal act with the same meaning.

The income tax provisions of the federal revenue act of 1918 allowed the taxpayer a deduction for gifts or contributions to corporations organized and operated exclusively for religious, charitable, scientific, or educational purposes, or for the prevention of cruelty to children and animals. Later posts of the American Legion and women's auxiliaries thereof were added. The act at first exempted all those corporations from paying the tax. Public cemeteries were not included, but were subsequently added by a separate section.[2] These sections of the statutes have been reënacted without change, except for some additions, in 1924, 1926, 1928, 1932, 1934, 1936, and 1938.[3]

[2]The several statutes are cited and quoted in Schuster v. Nichols (D. C. Mass.) 20 F. (2d) 179.

[3]The provisions prior to 1936 are listed in Barton & Browning, Federal Income and Estate Tax Laws (6 ed.) pp. 88, 89, 162, 163, and those for 1936 and 1938 in the 8th correlated edition of the same work, pp. 46, 122.

The federal income tax law received uniform administrative,[4] judicial,[5] and legislative interpretation that a public cemetery is not a charitable corporation. That interpretation was based upon the same reasoning as our decision in the Bishop Seabury Mission case, *supra,* that the enumeration of cemeteries, public charities, and the other subjects enumerated restricted the meaning of each so as to exclude the others enumerated, in consequence of which a public cemetery was not a public charity.

The case of Schuster v. Nichols [June 3, 1927] (D. C. Mass.) 20 F. (2d) 179, 181, involved the question whether a taxpayer was entitled to a deduction for a gift to a public cemetery. The reasoning in that case is the same as ours in the Bishop Seabury Mission case [90 Minn. 92, 95 N. W. 882]. The decision reviews the authorities. The holding was that a public cemetery is not a public charity, the court saying [20 F. (2d) 181]:

"The position of the word 'charitable,' in a sentence including religious, scientific, and educational purposes, all of which would be regarded as charitable purposes under the statute of 43 Eliz., points irresistibly to the conclusion that Congress was here using the word 'charitable' in its more narrow and restricted sense, as signifying those corporations which were organized and maintained exclusively for eleemosynary purposes."

While the decision was in accord with, it was not based on, prior administrative interpretation of the language.

On August 31, 1927, the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury in the exercise of statutory authority, promulgated a regulation that a public cemetery is not a public charity, citing and quoting in full the decision in Schuster v. Nichols (D. C.) 20 F. (2d) 179, as the basis of the regulation. T. D. 4086, 29 Treas. Dec. I. R.

---

[4] A gift to a public cemetery is not one to a corporation organized and operating exclusively for charitable purposes. I. R. B. 1922-2, A. R. R. 1122, p. 142. This ruling cites and reviews many judicial decisions.

[5] Schuster v. Nichols, *supra,* note 2.

304. The board of tax appeals followed the regulation on March 26, 1928, in Craig v. Commr. of Int. Rev. 11 B. T. A. 193, citing Schuster v. Nichols.

There were three reënactments of income tax provisions containing the language here involved without alteration after construction by the administrative regulation, *viz.*: in 1928, 1932, and 1934, prior to the enactment of the federal social security act in 1935. Where a statute has received a known, settled construction we have said that upon reënactment the legislature must be presumed to have adopted and that the reënacted statute should receive the prior construction. Wenger v. Wenger, 200 Minn. 436, 274 N. W. 517. In Helvering v. Bliss, 293 U. S. 144, 55 S. Ct. 17, 79 L. ed. 246, 95 A. L. R. 207, the sections containing the language involved here were held to have been approved by congress by repeated reënactment without change. These sections are printed in the marginal notes to the decision. The meaning of the statute after such reënactment was the same as if congress had expressly declared that a public cemetery is not a public charity. In Helvering v. R. J. Reynolds Tobacco Co. 306 U. S. 110, 115, 59 S. Ct. 423, 426, 83 L. ed. 536, it was held that where congress reënacts a revenue statute without change after it has been construed by administrative regulation "congress must be taken to have approved the administrative construction and thereby to have given it the force of law."

Thereby the rule of Schuster v. Nichols (D. C.) 20 F. (2d) 179, which was the basis of the regulation that a public cemetery is not a public charity, became a part of and was given the force of statutory law. There is no room for the view that a public cemetery is a public charity where the lawmaking power has legislated to the contrary.

Congress exercised its legislative power to manifest its intention by adopting the meaning given to its language by the prior administrative interpretation. Of course its action was prospective in operation. The lawmaking branch declares its own intention "with a plausible aim; for it professes to furnish

aid to a correct understanding of its intention, and thus to facilitate the primary judicial inquiry in the exposition of the law." 2 Lewis' Sutherland, Statutory Construction (2d) § 358, pp. 683-684. See 25 R. C. L. p. 1047, § 275.

This clause has been a pattern for similar provisions not only in the social security but in other federal revenue acts such as the estate tax[6] and gift tax acts.[7] The estate tax law was enacted in 1918. In 1929 the board of tax appeals sustained the construction of the act by the commissioner of internal revenue that the language in question did not comprehend a cemetery of the kind involved here. Wilber Nat. Bank, etc. v. Commr. of Int. Rev. 17 B. T. A. 654. The act has been reënacted since without change,[8] thereby making such construction part thereof and giving it the force of law.

Congress used the words in the social security act with the same meaning as in the income tax provisions of the various revenue acts. The revenue acts of the United States are *in pari materia*. 25 R. C. L. p. 1068, § 292, note 10, citing many decisions of the Supreme Court of the United States. Not only are statutes presumed to have been passed with deliberation and full knowledge of all existing legislation on the subject, but they are deemed to have been regarded by the lawmakers as being parts of a connected whole, where they are *in pari materia,* although considered by the legislature at different times and under distinct and varied aspects of the subject. "Such a principle is in harmony with the actual practice of legislative bodies, and is essential to give unity to the laws, and connect them in a symmetrical system." 2 Lewis' Sutherland, Statutory Con-

---

[6]Estate tax. See 26 USCA, § 812(d), pp. 110-111, note on subd. (d).

[7]Gift tax. See 26 USCA, § 1004(a)(2)(B), pp. 214-215, note on subd. (a)(2)(B).

[8]Estate tax. Reënactments of act of 1918 in 1921, 1924, and 1926, Barton & Browning, Federal Income and Estate Tax Laws (6 ed.) pp. 504-505, the others listed in note 26 USCA, § 812(d).

Gift tax. Note 26 USCA, § 1004(a)(2)(B); Barton & Browning, Federal Income & Estate Tax Laws (8 ed.) p. 548.

struction (2 ed.) p. 853, § 448. The several provisions are therefore to be construed as governed by the same spirit and policy. Where the same language is used in different sections it will be presumed that it is used with the same meaning until the contrary is shown. While the reasons which have just been stated are in themselves sufficiently persuasive to compel the conclusion that the language has the same meaning in both acts, it affirmatively appears from the deliberations of congress that such was the intention, thus putting the matter beyond all dispute. When the bill for the social security act was before congress, the language in question was identical with that of the income tax law. An amendment was proposed to add hospitals to the list of subjects excluded from the act's coverage. The amendment was withdrawn lest it interfere with the long-continued construction given the language by the Commissioner of Internal Revenue in interpreting the income tax law.[9] Thus it appears that the congress not only deliberately used the same language in the social security act as in the income tax law, but that it did so with the intention that the language in the social security act should have the same

[9]The Social Security Bill went to conference and the managers on the part of the House reported the following action:

"Amendment No. 15: The House Bill in defining the term 'employment,' as used in Title II relating to the payment of Federal old-age benefits, excepted service performed in the employ of a corporation, community chest, fund, or foundation, organized and operated exclusively for religious, *charitable,* scientific, literary, or educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual. The Senate amendment adds to the list of purposes 'or hospital' as a clarifying amendment. The Senate recedes, the conferees omitting this language as surplusage, based on the fact that the Internal Revenue Bureau has uniformly construed language in the income-tax laws, identical with that found in the House bill, as exempting hospitals not operated for profit, and also on the fear that the insertion of the words added by the Senate amendment might interfere with the continuation of the long-continued construction of the income-tax law." House Report No. 1540, July 16, 1935. Statement of Managers. Reprinted I. R. B. 1939-2, p. 626.

meaning as in the income tax law. The regulation, it is to be remembered, was based on the decision in Schuster v. Nichols (D. C.) 20 F. (2d) 179, *supra,* holding that a public cemetery is not a corporation organized and operated exclusively as a public charity. There was the clearest intention to adopt that holding as the correct interpretation of the words in the social security act.

The state of Minnesota adopted the Minnesota unemployment compensation act on December 24, 1936.[10] The language in question is an exact copy of that in the federal social security act. The federal social security authorities furnished forms of bills to the state authorities, which were adopted with little, if any, change. Minnesota, like Massachusetts, Wisconsin, and other states, adopted the language in question without any change. The state act was adopted with a view to approval by the federal authorities, which has been given, in order to obtain federal contributions of funds and other benefits. Where the state government, acting independently in its own sphere, copies a federal statute, the state act will be construed to have the same meaning as the federal act. Pittsburgh Plate Glass Co. v. Paine & Nixon Co. 182 Minn. 159, 234 N. W. 453. In Campbell v. Motion Picture M. O. Union, 151 Minn. 220, 229, 186 N. W. 781, 27 A. L. R. 631, the question was whether the state antitrust law should be construed the same as the Sherman federal antitrust act, from which it was copied. There were persuasive arguments against the construction of the Sherman act adopted by the federal courts. We held that the state statute was intended to have the same meaning as the federal act and followed the federal rule, pointing out that it would be anomalous to have the state and federal courts applying different rules to the same facts under identical provisions of law, and quoted Mr. Justice Mitchell in National Bank of Commerce v. C. B. & N. R. Co. 44 Minn. 224, 235, 46 N. W.

[10]Act of December 24, 1936, Ex. Sess. L. 1936, c. 2.

342, 346, 9 L. R. A. 263, 20 A. S. R. 566, speaking on a question of commercial law where no statute was involved:

"The inconvenience and confusion that would follow from having two conflicting rules on the same question in the same state, one in the federal courts and another in the state courts, is of itself almost a sufficient reason why we should adopt the doctrine of the federal courts on this question."

The statutes involved in the Pittsburgh Glass and the Campbell cases, as well as the principles of law involved in the National Bank of Commerce case, related to the independent purposes and objects of the state of the same kind as those of the federal government. The statute involved here is not only the same in kind, but was enacted to accomplish the same purposes and objects as the federal act, not through independent action by the state, but in conjunction and coöperation with the federal government. Our statute is in the form suggested by federal agencies and has their approval. That it was intended to have the same meaning is manifest. In speaking of the relation between the federal act and those of some 32 states, including Minnesota (these are referred to in the opinion and marginal note 10), Mr. Justice Cardozo in Steward Machine Co. v. Davis, 301 U. S. 548, 588, 57 S. Ct. 883, 891, 81 L. ed. 1279, 109 A. L. R. 1293, expressed the thought aptly as follows: "The Social Security Act is an attempt to find a method by which all these public agencies may work together to a common end." There can be no justification here for not construing our act as having the same meaning as the federal act—that a public cemetery is not a public charity.

■ The exemption of property from taxation does not comprehend exemption from the payment of excise and impost taxes by the owner of the exempted property, especially those which are not imposed in lieu of property taxes. 26 R. C. L. p. 315, § 276, note 13; 1 Cooley, Taxation (4 ed.) p. 101. In Steward Machine Co. v. Davis, 301 U. S. 548, 57 S. Ct. 883, 891, 81 L. ed. 1279, 109 A. L. R. 1293, *supra,* it was held that the tax

in question was an excise or an impost. In Beeland Wholesale Co. v. Kaufman, 234 Ala. 249, 174 So. 516, a tax of this kind was held not to be a property or income tax, but a specific tax which the state is not restrained from imposing.

■ Nor do the laws exempting from the levy of execution the property of cemetery corporations of the area limited by statute throw any light on the question. Exemption laws relate to debts and obligations voluntarily incurred, not to taxes. 22 Am. Jur., Exemptions, § 111. We deem such statutes irrelevant here.

■ Finally, it is suggested by defendant that it is without power to pay the tax. It has the power to defray the necessary expenses in the management and care of the cemetery under § 13 of the 1851 law and 2 Mason Minn. St. 1927, § 7563. The labor for which the unemployment taxes are imposed is employed in connection with the management and care of defendant's cemetery. It is alleged that it has funds for those purposes. The power to pay the expenses of operating the cemetery includes the power to pay the tax in question. The tax being an excise or impost is an expense as much as labor, supplies, and whatever else may be included in that term. Foster v. Goddard, 66 U. S. 506, 17 L. ed. 228; Kane v. Schuylkill F. Ins. Co. 199 Pa. 205, 48 A. 989. In Wolford v. Crystal Lake Cemetery Assn. 54 Minn. 440, 447, 56 N. W. 56, 58, we held that although plaintiff was not entitled to foreclose a mortgage on cemetery property, he doubtless could "avail himself of a remedy." The obligations of a cemetery association may be enforced by an appropriate remedy. Sullivan v. Mount Carmel Cemetery Assn. 244 N. Y. 294, 155 N. E. 580. It is sufficient now to adjudicate the liability. Diocese of St. Paul v. City of St. Paul, 138 Minn. 67, 163 N. W. 978. The suggestion is without merit.

Our conclusion is that defendant is not a charitable corporation and is subject to the tax. It was error to hold otherwise.

DEFENDANT'S APPEAL.

■ Defendant claims that some of its employes, who are exclusively employed in a greenhouse on the cemetery grounds propagating plants and flowers 'for beautifying and maintaining the cemetery and sale to lot owners for planting on graves, are excluded from the act as "agricultural labor" under 3 Mason Minn. St. 1940 Supp. § 4337-22H(6)(d). The provision of our act, like those of many other states, is taken verbatim from the federal social security act of 1935.[11]

The federal statute as originally enacted, and the state statutes which copied it, do not define the term "agricultural labor." The term "agricultural labor" was not by any means a new one. The workmen's compensation acts of various states contained provisions excluding "agricultural employments" and "farm labor." These terms have been used as practically synonymous. The definition in Webster's International Dictionary that "agriculture is the art or science of cultivating the ground, *especially in fields* or in large quantities, including the preservation of the soil, the planting of seeds, the raising and harvesting of crops, and the rearing, feeding and management of live stock; tillage; husbandry; farming," is generally accepted. The terms include all farm work and work incidental thereto. 1 Schneider, Workmen's Compensation Law (2 ed.) § 31.

The principles announced in our decision in Klein v. McCleary, 154 Minn. 498, 192 N. W. 106, 107, that the farm labor must be done on a farm to come within the exclusion, has been generally followed in construing the terms "agricultural" and "farm labor," as used in workmen's compensation and social security acts. In the Klein case the employer operated a summer resort at which he received guests for hire the same as any innkeeper. The employe did a variety of work around the resort such as making hay, planting pota-

---

[11]Act of August 14, 1935, c. 531, Title II, § 210(b)(1), 49 St. 625, 42 USCA § 409(b)(1).

toes, taking care of horses, milking cows, and [154 Minn. 499] "other work ordinarily done by a farm hand." While engaged in pulling stumps and clearing land, he received injuries from which he died. We held that the employe was *not* a farm laborer, saying [154 Minn. 500]:

"Klein was not working on a farm but on land used as a summer resort. * * * Klein was not working for a farmer or in the usual course of the business of farmers. * * * The workman's calling is not the test, but rather the nature of his work. Here, the work of clearing the land was in furtherance of the business of the landowner as the proprietor of a summer resort, and not in furtherance of the business of a farmer."

We pointed out that, although clearing land to prepare it for cultivation as a farm is farm work, it does not follow that such work is farm work where it is done in improving and developing a summer resort. The consequence is that unless the work is done on a farm it is neither farm nor agricultural labor. Many cases supporting this view are cited in the text cited *supra*.

In Hein v. Ludwig, 118 Pa. Sup. 152, 179 A. 917, 918, an employe engaged in raising plants and flowers in a commercial greenhouse located on a 50-acre tract of land was held not to be a person engaged in "agriculture." By reasoning analogous to ours in Klein v. McCleary, 154 Minn. 498, 192 N. W. 106, the court held that a greenhouse is not a farm, saying [118 Pa. Sup. 154]: "There is no evidence that any part of the property was cultivated or used as a farm." The operation of a greenhouse was held to be more akin to industry than to agriculture in that production in a greenhouse is under artificial, while agricultural activity is conducted under natural, conditions.[12] No case has been cited to sustain a contrary view.

---

[12]At p. 156 of 118 Pa. Sup. the court said:

"By the same token, agriculture, in the usual and commonly accepted sense of the term, does *not* include the operation of commercial green-

No court decision has been called to our attention construing the clause of the federal act of 1935 excluding agricultural labor, but the provision has received uniform administrative interpretation by regulation[13] and rulings[14] that in order to constitute agricultural labor the service must be rendered on a farm of which the employer is the owner or tenant with the result that the service of the employes engaged in propagating flowers and plants in a greenhouse does not constitute agricultural labor, unless the greenhouse is situated upon a farm of which the employer is the owner or tenant.

Our state regulation is identical with that of the federal regulation adopted under the federal 1935 act, as are many of the regulations of other states. These regulations have been uniformly sustained as proper interpretations of the statutes involved. In Park Floral Co. v. Industrial Comm. 104 Colo.

---

houses; nor is an employee in charge thereof an agricultural worker. The operation of such greenhouses is more akin to industry than to agriculture. They produce under artificial conditions; while the raising of crops, the growing of fruit and other similar agricultural activities are under natural conditions. They may be erected and operated practically anywhere a factory can be erected and operated. Such an enterprise is not one of those agricultural activities consisting of, or directly related to, the cultivation of the ground in the sense of husbandry. The fact that plants and flowers raised therein are products of the soil is not controlling, but rather that this is, done under artificial conditions in a commercial plant. It is our opinion that the business of the defendant does not come within the term 'agriculture' as used in the supplement to the Workmen's Compensation Act, *supra*, and that the claimant, who operated these greenhouses as an employee of the defendant, was not an agricultural worker; nor was he engaged in agriculture."

[13]I. R. B. 1937-1, S. S. T. 125, p. 397.

[14]*I.e.*, services rendered in a greenhouse or other structure located on a farm of which the employer is the owner or tenant have been held to be agricultural labor, but not where the greenhouse or structure was not located on a farm, in growing vegetables, I. R. B. 1937-2, S. S. T. 218, p. 412; tomato plants, I. R. B. 1938-2, S. S. T. 342, p. 308; and mushrooms, I. R. B. 1937-2, S. S. T. 231, p. 417, and I. R. B. 1938-1, S. S. T. 293, p. 432.

350, 91 P. (2d) 492, the state regulation that an employe of a commercial greenhouse is not an agricultural laborer was sustained for the reason that the employe was not employed on a farm. That case is decisive here. In Great Western Mushroom Co. v. Industrial Comm. 103 Colo. 39, 82 P. (2d) 751, a state regulation that growing mushrooms in sheds where temperature and humidity were controlled, as in a greenhouse, was held not to be agricultural labor was upheld. In H. Duys & Co. Inc. v. Tone, 125 Conn. 300, 5 A. (2d) 23, a state regulation that processing of tobacco in a warehouse to make it salable after it had been grown, picked, and cured was not agricultural labor was sustained. The cited cases apply the rule that unless the labor is on a farm or in connection with a farming operation on a farm of which the employer is owner or tenant the labor is not agricultural. The holdings are in accord with the views which we have heretofore announced and should be followed. Here there is no claim that the cemetery is a farm, or that the labor was in connection with a farming operation. Hence the employes in question are not excluded as agricultural labor.

The argument further is that the judicial and administrative construction of the term "agricultural labor" was not only incorrect, but that congress amended the act so as to declare its true meaning by ample definition of the term contrary to such construction. The amendment[15] included in the term "agricultural labor" all kinds of labor held to be such under the regulation by administrative construction of the act in substantially the same language as the regulation and many kinds of labor which were held not to be agricultural labor under the regulation by new provisions in the amendment which are discussed in the report of the Ways and Means Committee[16] explaining the scope and purpose of this and other amendments made at the same time.

---

[15]26 USCA, § 1607(1); Act of August 10, 1939, c. 666, Title VI, § 614(1), 53 St. 1392.

[16]House of Representatives Report No. 728, 76th Cong. First Sess. June 2, 1939, reprinted I. R. B. 1939-2, p. 538.

Defendant claims that it comes under the last sentence of the amendment, which reads as follows:

"As used in this subsection, the term 'farm' includes stock, dairy, poultry, fruit, fur-bearing animal, and truck farms, plantations, ranches, nurseries, ranges, *greenhouses* or other similar structures used primarily for the raising of agricultural or horticultural commodities, and orchards." 53 St. 187, as amended August 10, 1939, c. 666, Title VI, § 614, 53 St. 1392, 1396.

The argument is staked on the proposition that the amendment simply defined the term "agricultural labor" as congress intended it in the 1935 act and that it did not change the law. If that proposition cannot stand, the argument based thereon falls with it. The amendment discloses an intention to continue the statute in part and to change it in part. There was not only clarification, but change of meaning. Definition so far as it was in the language of the regulation approved and adopted the regulation and the prior administrative construction of the 1935 act. Thus it clearly appears that both the legislative and executive interpretation of the act were in accord. If the statute had stopped short of the last sentence of the amendment, labor performed in a greenhouse would have been excluded only if the greenhouse was located on the employer's farm. In order to exclude labor in a greenhouse not located on the employer's farm it was necessary to enlarge the definition of agricultural labor so as to cover such greenhouse labor. This appears upon the face of the statute to have been the purpose. The committee's report explaining the scope of the amendment makes this clear beyond argument.[17]

---

[17]The report says [I. R. B. 1939-2, p. 553]:

"[The last sentence of the subsection makes it clear that the term 'farm' as use in this subsection has a broad and comprehensive meaning. The term, for example, includes fur-bearing animal farms. Under present law, services performed in connection with the operation of such farms constitute covered employment. *The term also includes greenhouses or other similar*

The executive and legislative construction of the federal act of 1935 as not excluding labor performed in greenhouses except where the greenhouse was located on the employer's farm is of course not controlling, but either may be quite persuasive depending on the circumstances. Hayes-Lucas Lbr. Co. v. Johnson, 172 Minn. 504, 507, 215 N. W. 857 (legislative) ; Norwegian Nitrogen Products Co. v. United States, 288 U. S. 294, 53 S. Ct. 350, 77 L. ed. 796 (executive). Such construction being but an opinion as to the correct interpretation of an existing law is of course different from giving prior interpretation of a statute the force of law by congressional reënactment of the statute without alteration after such interpretation. The opinion is confined to mere expression of what the law is or was. The reënactment of a statute giving the force of law to the prior interpretation thereof involves an exercise of legislative power to make law. The latter is binding on us, the former is not.

We should remember that the amendment is a federal statute. The Supreme Court of the United States has adopted the view that congressional and executive construction of a statute is persuasive and entitled to great weight. First Nat. Bank v. Missouri, 263 U. S. 640, 658, 44 S. Ct. 213, 68 L. ed. 486. State courts should follow the rule of the federal courts in cases involving federal statutes. Vassau v. N. P. Ry. Co. 69 Mont. 305, 221 P. 1069.

To follow the legislative and executive construction is not to be controlled thereby in decision. In the circumstances of

*structures used primarily for the raising of agricultural or horticultural commodities, regardless of their location.* Under the existing exception, labor performed in some greenhouses is excepted while labor in others is not. The inclusion of greenhouses of the kind specified, within the meaning of the term 'farm,' will make for a more uniform treatment of greenhouse labor and lessen the administrative difficulties which this class of cases presents. Greenhouses used primarily for purposes such as storage or display purposes or for the fabrication of wreaths and corsages (usually in connection with the operation of a retail establishment) do not, of course, come within the exception.]"

this case, such construction is not only entitled to the weight and respect ordinarily accorded to those branches of the government, but there is no justification for refusing to follow it. Such construction, quite apart from the federal social security and the state unemployment compensation acts, accords with the common understanding of the language. It has the sanction of prior judicial and executive construction. The legislative practices of congress in the enactment of the social security and revenue laws demonstrate that it has considered other laws *in pari materia* containing the same language and the judicial and executive interpretation thereof, thereby giving the assurance of painstaking care in expressing its intention. Finally, it is only reasonable to assume until the contrary is shown that the makers of the law (congress was composed of substantially the same membership in 1935 and 1939) knew what they intended.

So far from showing that the act as originally enacted should be construed as exempting laborers in greenhouses not located on a farm, the amendment shows that the real meaning was that such labor should not be exempted.

No claim is made that the 1939 amendment of the federal act operates to amend our state act. If so advised, the statute can be amended by the legislature to conform to the federal act as amended.

There should be a reversal on plaintiff's appeal and an affirmance on defendant's appeal.

Reversed on plaintiff's appeal.

Affirmed on defendant's appeal.