C. LLOYD LAWLOR, AS EXECUTOR OF THE ESTATE OF
EDITH LAWLOR AND C. LLOYD LAWLOR, INDIVIDU-
ALLY, PLAINTIFF-APPELLANT, CROSS-RESPONDENT,
v. CLOVERLEAF MEMORIAL PARK, INC., A CORPORA-
TION, AND CLOVERLEAF MEMORIAL PARK ASSOCIA-
TION, DEFENDANTS-RESPONDENTS, CROSS-APPEL-
LANTS, v. JOSEPH LEPREE AND THE RAHWAY HOS-
PITAL, THIRD-PARTY DEFENDANTS-RESPONDENTS.

Argued April 7, 1970—Decided June 22, 1970.

*Mr. Kenneth J. McGuire* argued the cause for the plaintiff-appellant and cross-respondent (*Messrs. Stein, Bliablias & Goldman,* attorneys).

*Mr. Stephen J. Foley* argued the cause for the defendants-respondents and cross-appellants (*Messrs. Campbell, Mangini, Foley, Lee & Murphy,* attorneys).

*Mr. Daniel K. Van Dorn* argued the cause for the defendant-respondent The Rahway Hospital (*Messrs. Gleeson, Hansen & Pantages,* attorneys).

*Mr. Thomas T. Chappell* argued the cause for the defendant-respondent Dr. Joseph Lepree (*Messrs. Lamb, Blake, Hutchinson & Dunne,* attorneys; *Mr. William J. Cleary, Jr.,* on the brief).

The opinion of the court was delivered by

JACOBS, J. The Law Division granted summary judgment in favor of Cloverleaf along with summary judgment in favor of Dr. Lepree and The Rahway Hospital insofar as the plaintiff's claims against them under the Survival Act (*N. J. S. A.* 2A:15–3) were concerned. It denied summary judgment with respect to the plaintiff's claims against the Doctor and the Hospital under the Wrongful Death Act (*N. J. S. A.* 2A:31–1 *et seq*). 101 *N. J. Super.* 134 (1968). On appeal, the Appellate Division reversed the summary judgment as to Cloverleaf, affirmed the summary judgment as to the Survival Act claims and reversed the denial of summary judgment as to the Wrongful Death Act claims. 106 *N. J. Super.* 374 (1969). We granted cross petitions for certification. 54 *N. J.* 582 (1969).

On September 6, 1964 Mrs. Lawlor went to the Cloverleaf Memorial Park in Woodbridge. While placing flowers on her mother's grave she fell into a concealed hole and was injured. She was later attended to by Dr. Lepree and was hospitalized at The Rahway Hospital. She died on December 23, 1966, allegedly as a result of the injuries sustained in the fall and an infectious disease contracted while she was hospitalized.

On February 16, 1965 Mrs. Lawlor and her husband, suing *per quod,* filed a complaint against the defendant Cloverleaf Memorial Park, Inc. (the Corporation) and the defendant Cloverleaf Memorial Park Association (the Association). It charged the defendants with negligence and sought compensatory damages. The defendants filed their answer and on July 5, 1966 they filed a third-party complaint against Dr. Lepree and The Rahway Hospital, alleging that the Doctor and the Hospital had negligently attended Mrs. Lawlor and that, as a result of their negligence, Mrs. Lawlor contracted an infectious disease and suffered additional injury subsequent to her fall.

On January 26, 1968 the trial court granted leave to substitute Mrs. Lawlor's executor as a plaintiff and to amend the complaint so as to include direct negligence charges by the plaintiff against the Doctor and the Hospital; these charges were admittedly the same as those earlier alleged by Cloverleaf in the third-party complaint against the Doctor and the Hospital.

On Cloverleaf's motion, the trial judge granted summary judgment. He found that the Corporation, Cloverleaf Memorial Park, Inc., was not the owner of the cemetery at the time of Mrs. Lawlor's accident and was therefore not responsible for its maintenance; this finding was never appealed and is not before us. He further found that although the Association, Cloverleaf Memorial Park Association, was the owner of the cemetery and was responsible for its maintenance, it was entitled to the immunity granted by the Legislature to nonprofit associations "organized ex-

clusively for religious, charitable, educational or hospital purposes." *N. J. S. A.* 2A:53A–7.

On motion of Dr. Lepree and The Rahway Hospital, the trial judge dismissed the count in the plaintiff's amended complaint under the Survival Act on the ground that it wsa barred by the two-year statute of limitations. *N. J. S. A.* 2A:14–2; 101 *N. J. Super.* at 140–43. He took the view that the amendment set forth a new cause of action and did not relate back to the filing date of the original complaint. 101 *N. J. Super.* at 142–43. He refused to dismiss the count under the Wrongful Death Act, holding that it embodied an independent action which accrued at the time of Mrs. Lawlor's death and was not barred by the statute of limitations. 101 *N. J. Super.* at 143–48.

In the Appellate Division, leave was granted to the plaintiff to take depositions as to the structure of Cloverleaf and its operations. The depositions disclosed pertinent facts which are summarized in 106 *N. J. Super.* at 384–86. In 1933 two groups of individuals, the Walker-London group and the Lustgarden group, owned tracts of land which comprised about 110 acres and which they conveyed to Cloverleaf Memorial Park, Inc. London later became a principal stockholder, director and officer of the Corporation and is now a trustee and president of the Cloverleaf Association. In the early 1950's the Corporation sold about 55 to 60 acres of the land to a builder for $60,000. Some of this money was used for cemetery development and the remainder was distributed to the Corporation's stockholders who included members of the two original groups and their descendants.

At about the same time the remaining 50 to 55 acres were transferred to the Association which issued bonds to the stockholders of the Corporation. These bonds were in the face amount of $345,000 and all but $20,000 remain unpaid. In addition, the Association is indebted to its president, Emanuel London, and to other members of his family for back salaries. The outstanding bonds remain in

the hands of the original owners of the land or members of their families.

The Association charges $450 for a two-grave plot and if all of the available graves were sold at one time the gross receipts would approximate $2,250,000. From the money received from each sale about 5% is placed in the perpetual care fund which is used for the keeping of the grounds and the maintenance of the graves. The remainder is placed in a general account which is used for Association purposes such as the payment of salesmen's and officers' salaries.

The Appellate Division expressed the view that although the immunity statute (*N. J. S. A.* 2A:53A–7) did not in specific terms refer to cemetery associations organized under the Rural Cemetery Act (*N. J. S. A.* 8:1–1 et *seq.*), it would apply to such associations so long as they were in fact created and operated for charitable purposes rather than private profit. 106 *N. J. Super.* at 382. Though the circumstances strongly suggested it, the Appellate Division withheld finding factually that Cloverleaf had been created and operated "for private profit under the guise of a charitable use"; instead it remanded that factual issue for determination by the trial court. 106 *N. J. Super.* at 386. Our study of the constitutional and legislative treatment of cemeteries within our State, along with the history and terms of *N. J. S. A.* 2A:53A–7, has led us to the firm belief that the Legislature never contemplated the inclusion of privately promoted nonreligious cemetery associations, such as Cloverleaf, within the highly special immunity afforded to associations "organized exclusively for religious, charitable, educational or hospital purposes." That being so, the summary judgment in Cloverleaf's favor may properly be vacated without the further factual finding called for by the Appellate Division.

It must be borne in mind that the question before us is not whether Cloverleaf now functions as a quasi-public charitable trust for under our cases it clearly must. See

*Frank v. Clover Leaf Park Cem. Assn.*, 29 *N. J.* 193 (1959); *Terwilliger v. Graceland Memorial Park Assn.*, 35 *N. J.* 259 (1961). The precise issue is whether it is an institution within the contemplation of the legislative immunity afforded, without any specific reference to cemeteries, to corporations or associations organized exclusively for "religious, charitable, educational or hospital purposes." *Cf.* 4 *Scott, Trusts* §§ 348.1, 402 (3*d* ed. 1967). In *In re Kuebler,* 106 *N. J. Super.* 13 (*App. Div.* 1969), the Fairview Cemetery claimed that a devise to it was not subject to inheritance tax under the provision in *N. J. S. A.* 54:34–4(d) which exempts devises to institutions or organizations operated exclusively "for religious, charitable, benevolent, scientific, literary or educational purposes." The cemetery had been in receivership as a charitable trust and, after the receivership, trustees were appointed to operate it under a supplement to the Rural Cemetery Act (*N. J. S. A.* 8:1–20.1). The Appellate Division held that, notwithstanding its acknowledged charitable trust aspects, the cemetery was not a charitable institution within the meaning of the tax exemption statute; in the course of its opinion it made the following comments which are highly pertinent here:

Our law has generally not treated cemeteries as equatable with charitable institutions. Whenever it was intended to embrace a cemetery as within the orbit of a tax exemption provision, it has always been done so expressly. For example, our 1947 *Constitution, Art.* VIII, § I, *par.* 2, refers to exemptions from taxation of real and personal property "used exclusively for *religious, educational, charitable or cemetery* purposes. as defined by law * * *." (Emphasis added). Again, although N. J. S. A. 54:4–3.6 exempts from taxation buildings and land owned by associations or corporations organized exclusively for "charitable" and other designated purposes, a *separate* legislative provision was deemed necessary and adopted to exempt "graveyards and burial grounds * * * and cemeteries." N. J. S. A. 54:4–3.9.

106 *N. J. Super.* at 18.

*Kuebler* has numerous counterparts elsewhere. *See* 106 *N. J. Super.* at 19; *Christgau v. Woodlawn Cemetery Assn.,*

208 *Minn.* 263, 293 *N. W.* 619 (1940); *Industrial Comm. v. Woodlawn Cemetery Assn.,* 232 *Wis.* 527, 287 *N. W.* 750 (1939); *Proprietors of Cemetery of Mount Auburn v. Fuchs,* 305 *Mass.* 288, 25 *N. E. 2d* 759 (1940); *Schuster v. Nichols,* 20 *F. 2d* 179 (*D. Mass.* 1927); *cf. Canton Cemetery Assn. v. Stayman,* 99 *Ohio St.* 28, 121 *N. E.* 819 (1918); *Donnelly v. Boston Catholic Cemetery Assn.,* 146 *Mass.* 163, 15 *N. E.* 505 (1888). In *Christgau* the Minnesota Supreme Court concluded that a public nonprofit cemetery was not within the exemption from unemployment compensation contributions afforded to corporations operated exclusively for "religious, charitable, scientific, literary, or educational purposes." The court stressed, as did the Appellate Division in *Kuebler,* that historically its constitution and statutes specifically listed cemeteries, alongside "charities," when cemeteries were actually intended to be included (293 *N. W.* at 621); it summarized its overall holding in the following fashion:

A corporation which owns and operates a public cemetery without profit is not organized exclusively for charitable purposes, within the meaning of clauses excluding corporations organized and operated exclusively for charitable purposes from state unemployment compensation acts which, like ours, copied the exclusion clause from the federal social security act. Proprietors of Cemetery of Mount Auburn v. Fuchs, Mass, 25 N. E. 2d 759; Industrial Commission v. Woodlawn Cemetery Ass'n, 232 Wis. 527, 287 N. W. 750. There is no authority to the contrary. Defendant is precisely what it purports to be,—a public cemetery and not a public charity. 293 *N. W.* at 622.

*Christgau* cited many supporting decisions including the opinion of Justice Holmes in *Donnelly v. Boston Catholic Cemetery Assn., supra.* There the Massachusetts Supreme Judicial Court rejected the contention of the defendant cemetery association that it was entitled to the charitable immunity from tort claims generally afforded under its common law principles to well recognized eleemosynary institutions, such as churches, hospitals, colleges and the like

(*McDonald v. Massachusetts General Hospital,* 120 *Mass.* 432 (1876)) ; the court's opinion expressed the thought that there was "little ground for calling it a charitable corporation." 15 *N. E.* at 507. *See also Town of Milford v. Commissioners of Worcester County,* 213 *Mass.* 162, 100 *N. E.* 60 (1912), where the Supreme Judicial Court of Massachusetts, in an opinion by Chief Justice Rugg, made the following comments in the course of its holding that the Oak Grove Cemetery was not entitled to a requested abatement of taxes:

The cemetery is a great benefit to the public, and has been and is maintained solely for that purpose. It is not required by law to maintain a burial place for the public or for any general class other than those to whom lots are sold, and its power is unrestricted to limit its membership. It has been held that there is no ground for calling a cemetery corporation, such as the one here in question, a charitable corporation. Donnelly v. Boston Catholic Cemetery Association, 146 Mass. 163, 15 N. E. 505. See Hopkins v. Grimshaw, 165 U. S. 342, 352, 353, 17 Sup. Ct. 401, 41 L. Ed. 739. But without placing the decision upon this ground, we are of opinion that a general view of the tax exemption laws manifests a legislative purpose not to include cemetery corporations under the designation of charitable or benevolent institutions.

100 *N. E.* at 61–62.

In *Canton Cemetery Assn. v. Slayman, supra,* the defendant cemetery was organized under Ohio legislation which provided for "the acquisition and location of burial grounds, for the application of income and receipts, and for specific exemptions from execution." 121 *N. E.* at 819. Indeed, the legislation was comparable to our own Rural Cemetery Act which expressly provides that lands actually used for cemetery purposes shall be tax exempt and free from execution. (*N. J. S. A.* 8:2–27). The plaintiff in *Slayman* brought a malicious prosecution action against the cemetery which sought to defend on the basis of the immunity from tort claims afforded by the Ohio common law to charitable institutions. The court rejected the defense on the view that when the legislation set forth the designated exemptions it

"impliedly recognized" civil liability for the cemetery's tortious acts. 121 *N. E.* at 820.

It is significant that in numerous decisions throughout the country, cemeteries have been held liable, without any suggestion of immunity, in tort actions for damages resulting from the negligent failure to maintain the cemetery grounds in proper condition. *See Hutchison v. Hillside Cemetery Assn.,* 212 *Minn.* 243, 4 *N. W. 2d* 81 (1942); *Burack v. Washington Cemetery, et al.,* 258 *App. Div.* 1071, 18 *N. Y. S. 2d* 3 (1940); *Cedar Hill Cemetery v. Ball,* 78 *F. 2d* 220 (D. C. Cir. 1935); *Meyer v. St. Augustine's Church of Bridgeport,* 109 *Conn.* 410, 146 *A.* 817 (1929); 14 *Am. Jur. 2d, Cemeteries,* § 8 at 705–07 (1964); 14 *C. J. S., Cemeteries,* § 29(b)(2) at 89 (1939). It is also significant that in no reported New Jersey case has any defendant cemetery association ever prevailed on a charitable immunity defense. In *Miller v. Evergreen Cemetery Co.,* 11 *N. J. Misc.* 558 (*Sup. Ct.* 1933), damage to the plaintiff's car, while she wes entering the cemetery to decorate graves in her family plot, was attributed to the defendant's negligence in the maintenance of the cemetery. The plaintiff recovered a money judgment in a tort action without any suggestion on the defendant's part that it was entitled to the charitable immunity then recognized by New Jersey's common law (*D'Amato v. Orange Memorial Hospital,* 101 *N. J. L.* 61 (*E. & A.* 1925)).

In *Spiegel v. Evergreen Cemetery Co.,* 117 *N. J. L.* 90 (*Sup. Ct.* 1936), judgment in a tort action against the defendant cemetery was sustained in an opinion which expressly noted that the defense of charitable immunity had not been raised. In *Long v. Rosedale Cemetery,* 84 *F.* 135 (*D. N. J.* 1897), the plaintiff filed a complaint seeking damages for injuries resulting from the negligence of the employees of the defendant cemetery. Although the District Court's holding that the complaint was not dismissible was apparently influenced by the absence of any showing as to whether the cemetery enterprise was designed to make a

profit, the court placed appropriate stress on the statutory provisions (now *N. J. S. A.* 8:2–27, 28, 29) that although the cemetery lands are free from execution, the cemetery revenues may under appropriate court order be sequestered and applied towards "the payment of any judgment." 84 *F.* at 136; *cf. Canton Cemetery Assn. v. Slayman, supra,* 99 *Ohio St.* 28, 121 *N. E.* 819.

In contrast with the aforecited cemetery cases, the books abound wtih decisions prior to 1958 in which well recognized eleemosynary institutions such as churches, hospitals, colleges and the like were held entitled to the defense of charitable immunity. *See D'Amato v. Orange Memorial Hospital, supra,* 101 *N. J. L.* 61; *Bianchi v. South Park Presbyterian Church,* 123 *N. J. L.* 325 (*E. & A.* 1939); *Jones v. St. Mary's Roman Catholic Church,* 7 *N. J.* 533, *cert. denied,* 342 *U. S.* 886, 72 *S. Ct.* 175, 96 *L. Ed.* 664 (1951); *Benton v. Y. M. C. A. of Westfield,* 47 *N. J. Super.* 372 (*App. Div.* 1957), *rev'd,* 27 *N. J.* 67 (1958). In 1958 our common law principle of charitable immunity was terminated by the holdings in *Collopy v. Newark Eye and Ear Infirmary,* 27 *N. J.* 29 (1958) and *Dalton v. St. Luke's Catholic Church,* 27 *N. J.* 22 (1958). In Collopy there was an extensive review of the cases here and elsewhere dealing with charitable immunity from tort responsibility; it is to be noted that none of those cases dealt with or even remotely touched upon our special constitutional and statutory provisions or judicial determinations affecting cemetery associations.

After *Collopy* was handed down the Legislature adopted a temporary Act (*L.* 1958, *c.* 131) and then a permanent Act (*L.* 1959, *c.* 90) which had the effect of largely restoring the charitable immunity. Nowhere in the history of the legislative process nor in the terms of the legislation is there anything to suggest that the Legislature thought of cemetery associations or contemplated their inclusion. Paragraph 1 of Chapter 90 provides that no nonprofit corporation, society or association organized exclusively for

"religious, charitable, educational or hospital purposes" shall be liable to respond for damages to any beneficiary of such association resulting from the negligence of its agents or servants. *N. J. S. A.* 2A:53A–7. Paragraph 3 provides that for the purposes of the Act, but not in limitation thereof, places used for "colleges, schools, academies, seminaries, historical societies, public libraries, religious worship, charitable or hospital purposes, the moral and mental improvement of men, women and children, nursing homes, rest homes, parish houses, auditoriums, houses of and for prayer * * *" shall be deemed to be operated for a "religious, charitable, educational or hospital purpose." *N. J. S. A.* 2A:53A–9. Paragraph 4 provides that the Act shall be deemed to be remedial and shall be liberally construed so as to afford immunity in furtherance of the public policy for the protection of associations organized for "religious, charitable, educational or hospital purposes." *N. J. S. A.* 2A:53A–10.

This direction for liberal construction is not pertinent here for it does not come into play until there is a determination that the institution seeking to assert the immunity is one organized for "religious, charitable, educational or hospital purposes" within the legislative contemplation. Cloverleaf of course acknowledges, as it must, that the Legislature omitted all specific reference to cemeteries, such as the one it operates, but it urges nonetheless that the Legislature silently contemplated their inclusion within the term "charitable" associations. However, this course would be wholly inconsistent with prior constitutional and legislative treatment of cemeteries. Thus Article 8, Sec. 1, Par. 2 of the 1947 Constitution provides against the alteration of the tax exemption of property used exclusively for "religious, educational, *charitable or cemetery* purposes" (italics ours). Similarly the Legislature's enactments have consistently dealt with cemetery tax exemptions explicitly and separately; they have not been included within statutes dealing generally with "charitable" institutions. *See In re*

*Kuebler, supra,* 106 *N. J. Super.* at 18; *N. J. S. A.* 54:4–3.6, 3.9. Furthermore, when the Legislature set out to grant various exemptions to cemetery associations it did so by comprehensive enactment which expressed its intended exemptions in specific terms embodying no suggestion of any immunity from ordinary tort responsibility. *See N. J. S. A.* 8:1–1 *et seq.; N. J. S. A.* 8:2–27, 28, 29; *cf. Canton Cemetery Association v. Slayman, supra,* 99 *Ohio St.* 28, 121 *N. E.* 819.

When *L.* 1959, *c.* 90 (*N. J. S. A.* 2A:53A–7 *et seq.*) was before the Legislature there was no express mention of cemeteries and they were presumably given no thought; if the Legislature had given them thought there is ample reason to believe that it would not have granted to them an immunity from tort responsibility. Unlike the well recognized eleemosynary institutions which were the subject of the common law immunity and which, after *Collopy,* actively sought its restoration by legislation, cemetery associations such as Cloverleaf have had an independent history marked by abuses and suggestions of private profit-making. *See Frank v. Clover Leaf Park Cem. Assn., supra,* 29 *N. J.* 193. The members of the Legislature were fully aware of this history (29 *N. J.* at 204) and it is hardly likely that they would have granted to them the immunity going far beyond the present statutory exemptions which were specifically designed to protect the burial grounds and the public interest in their preservation and maintenance. *N. J. S. A.* 8:2–27, 28, 29. As the circumstances in the case before us well illustrate, the grant of the immunity to such cemeteries would, while leaving the injured parties remediless, mainly serve to guard the financial hopes of the original entrepreneurs or their families who, as here, still hold the bonds issued by the Association. As already indicated, we are satisfied that the Legislature did not contemplate the inclusion of privately promoted nonreligious cemetery associations such as Cloverleaf within *N. J. S. A.* 2A:53A–7; accordingly the summary judgment for Cloverleaf is set

aside and the plaintiff's complaint against it is remanded to the Law Division for trial.

■ We come now to consideration of the lower courts' holding that the claims of the plaintiff under the Survival Act against The Rahway Hospital and Dr. Lepree were barred by the statute of limitations (*N. J. S. A.* 2A:14–2). That statute provides that every action for injury to the person caused by the wrongful neglect of another "shall be commenced within 2 years next after the cause of any such action shall have accrued." None of the statutory terms was ever defined by the Legislature and they have necessarily been implemented in the court rules and decisions which, as expressed in *Fernandi v. Strully*, 35 *N. J.* 434, 449 (1961), have conscientiously sought to apply the pertinent limitation "with due regard to the underlying statutory policy of repose, without, however, permitting unnecessary individual injustices." *See Union City Housing Authority v. Commonwealth Trust Co.*, 25 *N. J.* 330 (1957):

> These statutes create repose. They are "practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost." *Chase Securities Corp. v. Donaldson*, 325 U. S. 304, 314, 65 S. Ct. 1137, 1142, 89 L. Ed. 1628 (1945), quoted in *State by Parsons v. Standard Oil Co.*, 5 N. J. 281, 295 (1950). Their primary purpose is to compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend.
> 25 *N. J.* at 335.

When the litigation started, our court rules contained very broad provisions with respect to original complaints (*R. R.* 4:3–1, now *R.* 4:2–2), amendments thereof (*R. R.* 4:15–1, now *R.* 4:9–1), their relation back (*R. R.* 4:15–3, now *R.* 4:9–3), and third-party complaints (*R. R.* 4:14–1, now *R.* 4:8–1). Thus the complaint represented the commencement of the action (*R. R.* 4:3–1), it could be amended as of right before responsive pleading and thereafter with leave (*R. R.* 4:15–1), and the amendment would relate back when it arose out of the "conduct, transaction or occurrence"

attempted to be set forth in the original complaint, although the court, in addition to its power to allow the amendment could on terms "permit the statement of a new or different claim or defense in the pleading." *R. R.* 4:15–3. The defendant could, with leave, file a third-party complaint against any person "who is or may be liable to him for all or part of the plaintiff's claim against him." *R. R.* 4:14–1.

In *De Sisto v. Linden,* 80 *N. J. Super.* 398 (*Law Div.* 1963), Judge Fulop was called upon to apply the foregoing rules in their relation to the statute of limitations; he did so in very sensible manner, displaying proper consideration for the legislative purposes and the just interests of all those concerned. *See Fernandi v. Strully, supra,* 35 *N. J.* at 449; *Union City Housing Authority v. Commercial Trust Co., supra,* 25 *N. J.* at 335. The plaintiff was a passenger in a car which struck a manhole causing her injury. She sued the driver of the car along with the city and the city, in turn, filed a third-party complaint against the contractor who had constructed the sewer and paved the street. The plaintiff later sought to amend her complaint to name the contractor as a direct defendant but he objected on the ground that more than two years had elapsed since the accident. The Law Division allowed the amendment, pointing out that it would relate back, at least to the time of the filing of the third-party complaint. It stressed that within the two-year period the contractor had been fully advised, through the third-party complaint, as to the charge of negligence against him and had timely opportunity to prepare and defend; it quoted approvingly from *Tackling v. Chrysler Corp.,* 77 *N. J. Super.* 12, 16 (*Law Div.* 1962), where Judge Halpern noted that "courts should be liberal in allowing amendments to save actions, if possible, from the bar of the statute of limitations" and should disregard technical objections in the effort "to determine the real issues on their merits and to do substantial justice between litigants."

In *Greco v. Valley Fair Enterprises,* 105 *N. J. Super.* 582 (*App. Div.* 1969), the Appellate Division embraced the

holding in *De Sisto,* stating that it "accords with the spirit of our rules and is consistent with the objectives of repose and freedom from the burden of defending stale claims sought to be achieved by statutes of limitation." 105 *N. J. Super.* at 584. The plaintiffs had instituted a timely negligence action against Valley Fair. Within the two-year period, Valley Fair filed a third-party action against Di Brigida seeking indemnification or contribution by reason of his negligence. After the two-year period, the plaintiffs obtained leave to amend their complaint to join Di Brigida as a direct defendant. Di Brigida then appealed urging that the statute of limitations barred the amendment. His appeal was rejected in an opinion by Judge Labrecque who pointed out that "the amended complaint is based upon the same occurrence and the same wrong" referred to in the third-party complaint against him. While, as *De Sisto* pointed out (80 *N. J. Super.* at 403), there are out-of-state cases which have taken a more technical and restrictive approach, they are not at all persuasive here nor are they without conflict elsewhere. *See Wadsworth v. Boston Gas Co.,* 352 *Mass.* 86, 223 *N. E.* 2d 807 (1967).

Although *De Sisto* and *Greco* may be factually distinguished (106 *N. J. Super.* at 389), they clearly point towards the just and proper result in the case at hand. The plaintiff's complaint was filed well within the two-year period. Although it then sought damages from Cloverleaf alone, it dealt with Mrs. Lawlor's fall at the cemetery and the consequential injuries which included those now allegedly attributable to the negligence of The Rahway Hospital and Dr. Depree. In a broad sense these consequential injuries were part of the "conduct, transaction or occurrence" attempted to be set forth in the complaint within the purport of *R. R.* 4:15–3. *Cf. Wadsworth v. Boston Gas Co., supra,* 223 *N. E.* 2d at 810. After answer was filed, Cloverleaf duly sought and obtained leave to file a third-party complaint against the Hospital and the Doctor. *R. R.* 4:14–1.

The third-party complaint, which contained three counts, was actually filed well within the two-year period from the date of Mrs. Lawlor's fall and specifically alleged that she had engaged the Hospital and the Doctor for the "care and cure" of her injuries, that they had "negligently and carelessly attended" her, and that as a proximate result of their negligence and carelessness she "was caused to contract an infectious disease." The third-party complaint also set forth that the Hospital and the Doctor "were further negligent, careless and unskillful in that they did not properly diagnose or observe the said infectious disease and failed to render proper medical care, as a direct and proximate result of which said disease caused further injury and loss to the plaintiff." Cloverleaf, in each of its first two counts, sought indemnification from the Doctor and the Hospital and in its third count sought contribution under the Joint Tortfeasors Contribution Law. *N. J. S. A.* 2A:53A–1 *et seq.*

The answers by the Hospital and the Doctor to the third-party complaint were filed in September 1966, which was about two years after the filing of the original complaint and was well within two years from the date Mrs. Lawlor was discharged from the Hospital and her care by Dr. Lepree was terminated. The Doctor's answer was largely a general denial of the allegations in the third-party complaint but the Hospital's answer set forth, in addition to a general denial, various separate defenses including, *inter alia,* contributory negligence and assumption of risk, limited immunity under *N. J. S. A.* 2A:53A–8, and "the applicable statute of limitations" (*cf. Cooper v. Philadelphia Dairy Products Co.,* 34 *N. J. Super.* 301 (Law Div. 1955)).

The plaintiff's amended complaint, though filed at a later date, contained the same charges of negligence against the Hospital and the Doctor as were set forth in the third-party complaint. The answers to the amended complaint by the Hospital and the Doctor were similar to the answers filed earlier by them to the third-party complaint, although the Doctor's answer additionally set forth specific defenses of

contributory negligence and the applicable statute of limitations (*N. J. S. A.* 2A:14–2). We reject the Hospital's and the Doctor's limitation defense for we are convinced that, under the compelling circumstances presented here, the amendment to the complaint must be deemed to relate back, as in *De Sisto and Greco,* at least to the time of the filing of the third-party complaint. That course avoids individual injustice while fairly satisfying the objectives of the limitation statute.

When the third-party complaint was filed, the Hospital and the Doctor were made formally àware that they were being charged with negligence in the care of Mrs. Lawlor and that they were being sought to be held liable for the damages suffered by Mrs. Lawlor as the result of their negligence. From that point on they could not lie in repose but were called upon to prepare and defend. They had full and timely opportunity to do so and at no point did the negligence claims against them become stale. Though the plaintiff did not amend the complaint at the time of the filing of the third-party complaint so as to join the Hospital and the Doctor as direct defendants, the court rules and *De Sisto* were in the books and later amendment of the complaint with relation back should readily have been anticipated. The plaintiff's delay in amending the complaint did not in anywise prejudice the Hospital or the Doctor and we see no reason why it should now bar a just adjudication on the merits of the plaintiff's claims against them. The summary judgment with respect to the plaintiff's claims under the Survival Act against the Hospital and the Doctor is set aside and the claims are remanded to the Law Division for trial.

Since the Appellate Division entertained the view that the action under the Survival Act had been barred by limitation, it felt obliged by the New Jersey precedents to hold that the Wrongful Death action under *N. J. S. A.* 2A:31–1 was also barred by limitation. 106 *N. J. Super.* at 390–93; *Knabe v. Hudson Bus Transportation Co.,* 111 *N. J. L.* 333, 335 (*E. &*

A. 1933) ; *Coulter v. New Jersey Pulverizing Co.*, 11 *N. J. Misc.* 5 (*Sup. Ct.* 1932). In reaching this conclusion the cited cases, while recognizing generally that the Wrongful Death proceeding is a separate and distinct cause of action, subject to *N. J. S. A.* 2A:31-3 which provides that the action "shall be commenced within 2 years after the death of the decedent," placed primary stress on the following italicized language in *N. J. S. A.* 2A:31-1 :

When the death of a person is caused by a wrongful act, neglect or default, *such as would, if death had not ensued, have entitled the person injured to maintain an action for damages* resulting from the injury, the person who would have been liable in damages for the injury if death had not ensued shall be liable in an action for damages, notwithstanding the death of the person injured and although the death was caused under circumstances amounting in law to a crime. (Italics ours).

In *Coulter* the former Supreme Court held that where the decedent did not institute any action within the two-year period and died thereafter, his representative was barred by limitation; Justice Bodine expressed the thought that the statute gave "an action if the decedent had one" and since the decedent had lost his right of action by "lapse of time" his representative had none. 11 *N. J. Misc.* at 6–7. In *Knabe*, Justice Parker, speaking for the Court of Errors and Appeals, subscribed to the holding in *Coulter,* saying : "We agree that, where any right of action by the living party injured was barred by limitation before his death, the Death Act does not create a right of action in the personal representative." 111 *N. J. L.* at 335.

Although there are supporting out-of-state cases there are many to the contrary. 106 *N. J. Super.* at 392–93 ; *N. O. Nelson Mfg. Corp. v. Dickson,* 114 *Ind. App.* 668, 53 *N. E. 2d* 640 (1949) ; *McKee v. New Idea, Inc.,* 36 *Abs.* 563, 44 *N. E. 2d* 697, 717 (*Ohio Ct. App.* 1942) ; *Causey v. Seaboard Air Line R. Co.,* 166 *N. C.* 5, 81 *S. E.* 917 (1914) ; *German American Trust Co. v. Lafayette Box, Board & Paper Co.,* 52 *Ind. App.* 211, 98 *N. E.* 874 (1912). These cases take the

persuasive position that the statutory terminology "relates to the character of the injury, without regard to the question of time of suit or death." *Hoover's Admx. v. Chesapeake & O. Ry Co.*, 46 W. Va. 268, 33 S. E. 224 (1899). Much the same approach might be gathered from this Court's statement in *Graf v. Taggert*, 43 N. J. 303, 305–06 (1964), that the italicized language in *N. J. S. A.* 2A:31–1 was "intended to preclude recovery where the injured person could not have recovered because the defendant did not commit a wrongful act or the deceased's own conduct would have barred his right to recover."

In the light of our holding in the instant matter that the survival action was not barred by limitation, we need not pursue further the issue presented by the aforecited conflicting decisions; there is no dispute that where, as here, the survival action was not barred by limitation, the later death action, instituted well within 2 years after the death (*N. J. S. A.* 2A:31–3), was also not barred. *See Redick v. Rohm & Haas Co.*, 97 N. J. Super. 58 (*Law Div.* 1967) ; *cf. Kotkin v. Caprio*, 65 N. J. Super. 453 (*App. Div.*), *certif. denied,* 34 N. J. 470 (1961). Accordingly, the Appellate Division's reversal of the Law Division's denial of summary judgment as to the claims under the Wrongful Death Act is set aside and the claims are remanded to the Law Division for trial.

Reversed and Remanded.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.